E-FILED
Thursday, 28 July, 2016  04:24:27 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JERRY L. EALEY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-3146 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE :

Plaintiff Jerry Lynn Ealey appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g) .  This matter is before this Court for a Report and Recommendation on Ealey's Motion for Summary Judgment or Remand (d/e 15), and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 19).  For the reasons set forth below, this Court recommends that the Defendant Commissioner's Motion should be ALLOWED, Plaintiff Ealey's Motion should be DENIED, and the decision of the Commissioner should be AFFIRMED.

STATEMENT OF FACTS

Ealey was born on May 18, 1959.  He has a high school education.

Ealey previously worked as a plant operator.  As a plant operator, Ealey

kept machinery in operating condition at a sand and gravel company.

Ealey filed his application for Disability Benefits on April 17, 2012.  Ealey

alleged that he became disabled on December 1, 2011.  Certified

Transcript of Proceedings before the Social Security Administration (d/e 11)

(R.), 14, 58-60, 67.  Ealey suffers from diabetes, obesity, degenerative disc

disease, status post cervical spine surgery, and depression.  R. 16-17.

On January 31, 2011, Ealey saw orthopedic surgeon Dr. Stephen

Pineda, M.D.  Dr. Pineda stated that an MRI showed that Ealey had

degenerative changes in his cervical spine at C4-5, C5-06, C6-7, and to a

lesser degree at C3-4.  Dr. Pineda stated that the changes caused spinal

stenosis at those levels.  Ealey was experiencing pain in his neck and

shoulders.  Dr. Pineda recommended surgery on Ealey's cervical spine.

R. 384.  Ealey did not undergo surgery at that time.

On February 7, 2011, Ealey saw chiropractor Dr. John L. Kain, D.C.

Ealey complained of neck and arm pain.  Ealey reported that his left hand

had been going to sleep, and he was having trouble lifting his right arm

beyond 90 degrees.  Ealey also reported a few headaches in the prior

week.  On examination, range of motion in the cervical, thoracic, and lumbar spine was moderately restricted by pain.  Dr. Kain noted moderate spasm and tenderness on palpitation of the cervical and thoracic spine. Leg drop was positive bilaterally for lower back pain.  Foraminal compression was positive bilaterally for neck pain.  Strength in all extremities was 5/5.  Dr. Kain assessed cervicobrachial syndrome with myospasm, and secondarily lumbar facet syndrome.  Dr. Kain stated a June 25, 2010 MRI showed that Ealey had severe spinal stenosis with cord compression at C4-5-6-7.  R. 406.

On August 12, 2011, Ealey saw Dr. Kain.  Ealey complained of neck pain, lower back pain, stiffness in the back and neck, and numbness and tingling in the left arm and hand.  On examination, Kemp's test was positive for lower back pain. Straight leg tests were negative.  Leg drop test was positive bilaterally for lower back pain.  Strength in all extremities was 5/5. Dr. Kain assessed cervicobrachial syndrome with myospasm, and secondarily lumbar facet syndrome.  R. 408.

On November 7, 2011, Ealey saw endocrinologist Dr. David Hoelzer, M.D., for an endocrine follow up.  Dr. Hoelzer stated that Ealey had diabetic peripheral neuropathy and diabetic retinopathy.  Ealey reported stable numbness in his feet and toes.  Ealey's vision had also been stable.

Dr. Hoelzer assessed Type 2 diabetes with slowly improving control. Dr. Hoelzer discussed diet and exercise. Dr. Hoelzer continued Ealey's insulin medication. Dr. Hoelzer encouraged Ealey to keep him updated with the results of home glucose readings for insulin adjustment. R. 360-62.

On November 7, 2011, Ealey also saw Dr. Pineda. Ealey reported pain in his neck into his right shoulder. Dr. Pineda stated that an EMG study was descriptive of right radiculopathy and right carpal tunnel syndrome. Ealey denied any numbness or problems with his right hand. On examination, Ealey's "deltoid, biceps, triceps, wrist flexors and extensors, finger flexors and extensors, and everything fires well." Dr. Pineda concluded that Ealey did not require "emergent surgery on a clinical basis." R. 364.

On January 24, 2012, Ealey saw his primary care physician Dr. Dennis Yap, M.D. Ealey saw Dr. Yap for a follow up on an emergency room visit for swelling in his leg. Ealey appeared disheveled and in moderate pain. Ealey was 6 ft. 2 in. tall and weighed 278.2 pounds with a body mass index (BMI) of 35.7. Ealey walked with a left leg limp. Dr. Yap noted moderate pedal edema and left leg pain. Dr. Yap assessed cellulitis of the left leg. Dr. Yap told Ealey to keep his leg elevated, to wear thigh

high ted hose, and to stop smoking.  Dr. Yap refilled Ealey's prescription for clindamycin.  R. 428-29.

On March 8, 2012, Ealey saw Dr. Hoelzer.  Ealey reported that he felt well.  He reported that his glucose readings at home were running in the mid to upper 100s.  Ealey reported some numbness in his feet and toes, but no significant pain.  Ealey reported no changes in his diabetic retinopathy.  On examination, Ealey had a cyst in his skin over his left Achilles tendon.  Ealey had no peripheral edema or lesions.  Ealey had mildly diminished sensation in his toes.  Ealey's A1c reading was 7.8%.  Dr. Hoelzer noted that this reading had slowly decreased over time.  Dr. Hoelzer assessed type 2 diabetes mellitus with gradually improving control. Dr. Hoelzer continued Ealey's treatment program.  R. 357-59.

On April 3, 2012, Ealey underwent an MRI of his left ankle.  The MRI showed marked advanced diffuse tendinopathy and swelling in the left Achilles tendon.  The MRI also showed a partial tear in the posterior fibers of the tendon.  R. 401-02.

On April 10, 2012, Ealey saw podiatrist Dr. Timothy Graham, D.P.M., for a follow up on Ealey's Achilles tendon bursitis/tendonitis.  Dr. Graham reviewed the April 3, 2012 MRI results.  Ealey reported his pain level as 5/10.  Dr. Graham noted mild decrease in range of motion of the left ankle.

Dr. Graham prescribed a walking boot for the left ankle.  Dr. Graham instructed Ealey not to walk on his left foot without the boot.  R. 613-14.

On May 20, 2012, Ealey saw Dr. Yap for vertigo.  Dr. Yap found that Ealey had mild fatigue, dizziness, headaches, and vertigo.  Dr. Yap advised Ealey to control his sugar tightly.  Dr. Yap recommended weight loss, a low calorie diet, and daily exercise.  R. 436.

On May 22, 2012, Ealey saw Dr. Graham.  Ealey reported no pain in his left Achilles tendon.  On examination, Dr. Graham found considerable improvement.  Dr. Graham observed mild decrease in range of motion in the ankle.  R. 611-12.

On June 28, 2012, state agency physician Dr. David Bitzer, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Bitzer opined that Ealey could occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk for six hours in an eight-hour workday; sit for more than six hours in an eight-hour workday; frequently climb ladders, ropes, and scaffolds; but had no other physical functional limitations. R. 71-72.

On July 12, 2012, Ealey saw Nurse Practitioner Pamela Brodt in Dr. Hoelzer's office.  Ealey reported not taking his insulin in May due to cost of refilling his prescription.  Ealey also reported missing most of his NovoLog

doses regardless of whether he had insulin or not.  Ealey's A1c was 11%.
Ealey reported his blood sugar readings at home were in the 200s.  Brodt
stated that Ealey had peripheral neuropathy with decreased sensation in
both big toes.  On examination, Brodt found no edema, and Ealey could
move all extremities equally.  Brodt found decreased sensation to fine
monofilament touch in both big toes.  Brodt found that Ealey's had a normal
mood and affect.  Brodt assessed diabetes mellitus poorly controlled.
Brodt told Ealey he had to provide the results of regular blood sugar
readings at home before his insulin dosage could be adjusted.  R. 491-93.

On September 11, 2012, Ealey saw Dr. Hoelzer.  Ealey had not
reported any blood sugar readings from home since his last visit.  The
readings in Ealey's monitor for the prior 60 days averaged 161.  Ealey
reported that he "tended toward easy fatigability."  Dr. Hoelzer stated that
Ealey had peripheral neuropathy with chronic numbness in his feet and
toes, but no significant neuropathic pain or focal weakness.   On
examination, Dr. Hoelzer found diminished sensation in the toes.  Dr.
Hoelzer assessed poorly controlled type 2 diabetes mellitus.  Dr. Hoelzer
continued Ealey's insulin program.  R. 488-90.

On September 21, 2012, Ealey saw Dr. Yap for back pain and
depression.  Ealey reported arthralgia, back pain, joint stiffness, bilateral

leg pain, myalgia, and depression with feelings of sadness and stress, but no difficulty concentrating, no sleep disturbance, and no suicidal thoughts. On examination, Ealey had normal range of motion, strength, and tone. Dr. Yap assessed depression, neuropathic pain, and pitting edema. Dr. Yap prescribed Prozac for the depression. R. 509-12.

On October 5, 2012, Ealey saw Dr. Yap. On examination, Ealey weighed 275 pounds with a BMI of 35.3. Ealey reported that his depression was getting better. Dr. Yap found paresthesia in both lower extremities, and pain with range of motion in his back. Dr. Yap also found depression and sadness, but no anxiety, sleep disturbance, or suicidal thoughts. Dr. Yap assessed depression and neuropathic pain. Dr. Yap continued Ealey's prescription for Prozac. R. 506-08.

On October 8, 2012, Ealey saw Dr. Yap for sinusitis. Dr. Yap noted that Ealey had mild fatigue. On examination, Ealey weighed 277 pounds, with a BMI of 35.6. Ealey had full range of motion in his neck. Dr. Yap prescribed an antibiotic. R. 505.

On November 12, 2012, Ealey saw state agency psychologist Dr. Delores Trello, Psy.D., for a mental status examination. Dr. Trello found Ealey had a normal affect; he was oriented; and his immediate, recent, and remote memory was intact. Ealey told Dr. Trello that he bathed himself,

sometimes cooked, did laundry, drove around town, and went grocery shopping with his wife.  R. 536.  Dr. Trello assessed depressed, anxious mood associated with chronic pain and medical conditions; and adjustment disorder with depressed, anxious mood.  Dr. Trello assigned a Global Assessment of Function (GAF) score of 50 indicating serious impairment in vocational functioning.  R. 534-37.

On November 13, 2012, Ealey saw Dr. Kain.  Ealey reported lower back pain in the morning.  Ealey reported lower back pain, bilateral buttock burning pain and stiffness.  Dr. Kain assessed lumbar facet syndrome with myospasm.  R. 556.

On November 24, 2012, state agency psychologist Dr. David Voss, Ph.D., prepared a Psychiatric Review Technique assessment of Ealey.  Dr. Voss opined that Ealey's mental impairments caused mild restrictions on activity of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated periods of decompensation.  Dr. Voss noted that the mental status examination showed memory and concentration to be within normal limits.  R. 81.  Dr. Voss opined that Ealey's mental impairments were non-severe.  R. 80-81.

On November 27, 2012, state agency physician Dr. Calixto Aquino, M.D., prepared a Physical Residual Functional Capacity Assessment.  Dr. Aquino opined that Ealey could occasionally lift twenty pounds and frequently lift ten pounds; stand and/ or walk for six hours in an eight-hour workday; sit for more than six hours in an eight-hour workday; frequently climb ladders, ropes, and scaffolds; but had no other physical functional limitations.  R. 82-84.

On December 14, 2012, Ealey underwent a cervical MRI.  Dr. Pineda ordered the MRI.  The radiologist Dr. Joseph Baima, M.D., read the MRI and found that "Osseous structures are normal in alignment and signal characteristics.  The cord is normal in position and signal characteristics." Dr. Baima further stated that Ealey had severe canal and bilateral foraminal stenosis from C4-5 through C6-7 with moderate canal and severe bilateral foraminal stenosis at C3-4.  R. 703.

On December 17, 2012, Ealey saw Dr. Pineda.  Dr. Pineda stated that the new MRI showed multilevel cervical spondylosis with probable osteophyte disc complex at C4-5, C5-6, and C6-7.  Dr. Pineda stated that there was both anterior and posterior decompression.  Ealey reported some pain and burning into his upper extremity.  Dr. Pineda recommended surgery on Ealey's cervical spine.  Dr. Pineda also ordered another x-ray of

Ealey's spine.  R. 591-93.  The x-ray showed mild to moderate disc space narrowing at C4-5, C5-6, and C6-7.  R. 723.  Ealey agreed to undergo the surgery.

On January 4, 2013, Ealey saw Dr. Yap for a preoperative examination.  Ealey reported back pain, joint stiffness, myalgia, anxiety, depression, and sadness.  Ealey denied any crying spells, feelings of stress, sleep disturbance, or suicidal thoughts.  R. 725.  On examination, Ealey weighed 273 pounds with a BMI of 35.1.  Ealey had full range of motion in his neck and normal range of motion in his other joints, normal strength, and normal tone.  Ealey had an appropriate affect, normal speech, and grossly normal memory.  R. 726-27.

On January 10, 2012, Dr. Pineda performed anterior surgery on Ealey's cervical spine, and on January 31, 2012, Dr. Pineda performed a posterior surgery on Ealey's cervical spine.  R. 584, 684-87, 708.

On February 18, 2013, Ealey saw Dr. Pineda for a post-surgery follow up.  Ealey rated his pain as 0/10 at that time.  Dr. Pineda removed Ealey's stitches.  Dr. Pineda told Ealey "to limit his lifting to 10 pounds or so."  R. 682-83.

On February 21, 2013, Ealey underwent an x-ray of his cervical spine.  The x-ray showed a posterior cervical fusion from C3-C7 without

evidence of hardware complications and a stable anterior cervical fusion. R. 716.

On March 18, 2013, Ealey saw Dr. Pineda for a surgical follow-up. Dr. Pineda assessed post anterior/posterior cervical fusion six weeks currently doing well. Ealey had no numbness or weakness in his arms and legs. R. 581. X-rays taken that day showed the appearance of a stable post-operative cervical spine. R. 701.

On April 1, 2013, Ealey saw Nurse Practitioner Jennifer Jenkins in Dr. Pineda's office. Ealey rated his pain as 4/10 at that time. Ealey was healing from the surgery, but complained of some drainage and "stiffness in his neck as the day wears on." Jenkins prescribed Keflex for the drainage and ibuprofen or Aleve for the stiffness. R. 641.

On April 22, 2013, Ealey saw Dr. Pineda for a follow up incision check. Ealey reported his pain was 3/10 at that time. Dr. Pineda stated that Ealey was doing pretty well. R. 674.

On May 20, 2013, Ealey saw Dr. Pineda. Ealey rated his pain at 2/10 at that time. Ealey subjectively was "currently doing real nicely." On examination, Dr. Pineda found that Ealey's hip, knee, and ankle joints were "firing," his sensation was intact, his incision was clean and dry, and he had no problems with speech or voice. Dr. Pineda also stated that Ealey's

x-rays demonstrated good alignment.  Dr. Pineda scheduled a follow up examination in six months.  R. 648-49.

On July 9, 2013, Ealey saw Dr. Yap complaining of hip pain.  Ealey reported arthralgia, joint stiffness and myalgia, but was negative for limb pain.  On examination, Ealey weighed 270 pounds and had a BMI of 34.7.  Ealey walked with a limp.  Ealey had pain with range of motion in his hips.  Urinalysis showed hematuria and proteinuria.  Dr. Yap assessed hip pain, myalgia, and gross hematuria.  Dr. Yap prescribed Vicodin and Flexeril.  R. 560-61.

On June 10, 2013, Ealey saw Dr. Hoelzer.  Ealey reported that his diabetes had not been tightly controlled since February.  Ealey reported his home blood sugar tests showed blood sugar readings between 200 and 500.  Ealey reported that he had back surgery and no longer needed to wear a cervical collar.  He reported that his pain was improved but still present.  Dr. Hoelzer assessed type 2 diabetes with suboptimal control.  R. 654-55.

On July 9, 2013, Ealey saw Dr. Yap.  Ealey complained of hip pain.  Ealey was limping when he walked.  On examination, Ealey had pain in his hips bilaterally with range of motion.  R. 559-61.  X-rays taken that day showed no fracture or subluxation, joint space was maintained, and clips

along the medial left thigh.  The radiologist assessed no osseous findings.
R. 634.

On August 21, 2013, Ealey saw Nurse Practitioner Susan Nelson with
complaints of pain in passing kidney stones.  On examination, Ealey had
normal strength and range of motion, normal gait, and "was able to get on
and off the exam table independently."  R. 650-51.  An x-ray showed an
ovoid calcification in the expected region of the left renal pelvis.  R. 652-53.

On September 10, 2013, Ealey saw Dr. Hoelzer.  Ealey's home blood
sugar readings averaged 250 over the prior two weeks.  Ealey also had
peripheral neuropathy with numbness in his feet and toes.  Dr. Hoelzer
noted that Ealey was making a reasonable recovery from his cervical spine
surgery.  Dr. Hoelzer stated that Ealey had some easy fatigability.  Dr.
Hoelzer assessed type 2 diabetes mellitus with poor control.  R. 658-59.

On September 24, 2013, Dr. Yap completed a Medical Source
Statement Ability To Do Work-Related Activities (Physical) form.  Dr. Yap
opined that Ealey could occasionally lift ten to fifty pounds, but could not
frequently or continuously lift any amount of weight.  Dr. Yap opined that
Ealey could sit, stand, and walk for fifteen minutes at a time without
interruption, and could sit, stand and walk for a total of fifteen minutes in an
eight-hour workday.  Dr. Yap opined that Ealey could walk without a cane.

Dr. Yap opined that Ealey could reach, handle, and finger occasionally.  Dr. Yap opined that Ealey could occasionally climb stairs and ramps, stoop, and kneel; but could never crouch, crawl, or climb ropes, ladders, or scaffolds.  R. 594-99.

On October 22, 2013, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 32-66.  Ealey appeared in person and with his attorney.  Vocational expert James Lanier also appeared.  R. 34.

Ealey testified first.  He stated that he lived in a mobile home with his wife and an adult daughter.  An adult son lived in an apartment behind the mobile home.  Ealey said that he was right-handed, and graduated from high school.  R. 37, 39.

Ealey indicated he previously worked for a sand and gravel company as a plant operator.  He checked conveyor belts and other equipment to make sure that the equipment was operating properly.  The job also involved climbing stairs and ladders to check on equipment.  The job was not a supervisory position.  R. 59.  Ealey stopped working in November 2011.  Ealey said that his employer told him, "I've gotta let you go for medical reasons."  R. 47.  Ealey testified that he could not swing a hammer, which was required to maintain equipment.  He said that

maintaining equipment was a significant part of his job.  R. 58-59.  Ealey had worked the job for eighteen years when his employer let him go. R. 60.

Ealey earned $1,713.00 in 2012.  Ealey indicated that he earned the money working for a farmer in three to four days a week.  R. 40.  Ealey said that he worked primarily during planting and harvesting.  R. 60. Ealey indicated he stopped working for the farmer because "I can't turn my head around to back the tractors and equipment up into the corner of the field." R. 40.

Ealey said that he was taking Fluoxetine daily.[1]  He testified that he had taken Fluoxetine for three to four years.  Ealey indicated that the Fluoxetine helped with his mood.  R. 41.

Ealey said that he had a driver's license, and he drove the day before the hearing.  R. 43.  Ealey testified that he drove approximately fifty miles a week.  R. 44.

Ealey collected unemployment from November 2011 through September 2013.  He testified that he applied for work during that time period.  R. 39, 45.  Ealey said that when he applied for Disability Benefits, a representative of Social Security told him to apply for unemployment

---

[1] Fluoxetine is the generic version of Prozac.  See The PDR Family Guide to Prescription Drugs (9th ed. 2002), at 564.

benefits also.  R. 46.  Ealey related that he told a representative of the

unemployment benefits office that he applied for Disability Benefits, and

"They just kept sending me my checks . . . ."

R. 46-47.

Ealey testified that he had problems with his neck.  R. 47.  Ealey said

his recovery from his two neck surgeries was "not good."  He indicated that

he could not turn his neck, he could not "release my head up and look up,"

and he could not bend over because "it closes my breathing up."  Ealey

said he had pain all the time.  Ealey rated his pain at 2/10.  Ealey explained

that the pain increased if he moved his head or looked up or down.

R. 47-48.

Ealey indicated that he could walk for fifteen minutes at one time.

Ealey said that after fifteen minutes, "My hips just start to hurt so bad that

you just want to get down and crawl."  R. 48.  Ealey related that he was not

being treated for hip pain because he had to "go back to the doctor to have

him look at it."  R. 49.

Ealey testified that lifting more than three to five pounds made his

pain worse.  He said he felt the pain from lifting in his neck and shoulder.

Ealey indicated he took a generic form of Vicodin if he was doing

something "more strenuous," but otherwise he did not take Vicodin

because it did not agree with him.  Ealey said that nothing else caused him pain in his neck besides lifting and moving his head.  R. 49-50.

Ealey indicated he could sit for thirty minutes at a time.  He said that he had to stand up because his hips would start hurting.  Ealey testified that he could not stand in one place because of his pain.  R. 51.

Ealey initially testified that he could not reach over his head.  The ALJ then asked Ealey to raise his arms as high as he could.  Ealey complied.  The ALJ then asked Ealey how long he could hold his arms in that position "up above your head."  Ealey did not know how long.   R. 52.

Ealey said he could not bend over without holding on to something.  Ealey indicated that he needed to hold on to something in order to get back up.  Ealey said he had no problem climbing stairs.  R. 53.

Ealey related that he did not do any household chores.  He testified that he went to the grocery store with his wife once every two months.  He pushed the cart at the grocery store until he got tired and had to sit down.  Ealey said he could make himself lunch or breakfast, but could not cook a big meal. R. 54-55.

Ealey said the day before the hearing he got up at 8:00 a.m., ate a piece of toast, drank a glass of juice, and sat and watched television until 11:00 a.m.  He then went outside for a walk.  When he returned he made a

bologna sandwich for lunch and sat down to eat.  He let the dogs out into

an outside pen, and then brought the dogs back inside.  He sat and

watched television for an hour, went for a walk, and came back and

watched television until dinner time.  Ealey testified that this was a typical

day for him.  R. 55-56.

Ealey indicated that he stopped hunting because of his problems.  He

said that he did not go out very much.  He did not go to church.  He

socialized with his family members in his home.   He went out to eat once a

month.  R. 57.

Ealey related he took Fluoxetine for depression and problems with his

mood.  He testified that the medicine helped with his mood.  He said he

cried two to three times a week but he did not know why.  R. 57-58.

Vocational expert Lanier then testified.  The ALJ asked Lanier:

> I would now like you to assume you have an individual the
> same age, education and experience as the claimant. This
> individual is limited to light work, limited to frequent ladders,
> ropes and scaffolds.  Limited to occasional overhead reaching
> with the dominant upper extremity.  How would these
> restrictions affect the performance of claimant's past relevant
> work?

R. 63.  Lanier opined that such a person could not perform Ealey's past

relevant work as a plant operator.  Lanier opined that such a person could

perform the jobs of collator operator, with 3,700 such jobs in Illinois and

51,000 nationally; mail sorter, with 1,200 such jobs in Illinois and 32,000

nationally; and routing clerk, with 1,700 such jobs in Illinois and 112,000

nationally.  Lanier opined that these three jobs were representative of the

jobs that such a person could perform and not an exhaustive list.  R. 63.

Lanier testified that such a person would not be able to maintain

employment if he missed four more days of work per month or if the person

took an extra rest break periodically.  R. 64.  The ALJ then concluded the

hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his opinion on November 21, 2013.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant

to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined at Step 1 that Ealey had not engaged in substantial gainful activity since his alleged onset date of December 1, 2011.  R. 16.  The ALJ determined at Step 2 that Ealey suffered from the

severe impairments of diabetes, obesity, degenerative disc disease, and residual status post multiple spine surgeries.  R. 16.

The ALJ determined that Ealey's depression was not a severe impairment.  The ALJ acknowledged that Ealey testified that "he cries a lot, 'two or three times a week,' but does not know what causes it."  The ALJ noted that Ealey took Fluoxetine, but did not see a specialist.  Ealey's primary care physician prescribed the Fluoxetine.  The ALJ stated that Dr. Trello "gave him a GAF score of 50, as he reported being able to take care of his own personal needs (cooking, bathing, shopping, etc.)"  The ALJ noted that Dr. Trello found that Ealey's memory was intact.  The ALJ noted that Ealey had normal mood and affect in his examination on November 1, 2012, and January 4, 2013.  The ALJ noted that Ealey reported that his depression was better in his October 2012 examination, and Ealey's examinations in October 2012 and January 2013 were negative for anxiety, crying spells, feeling of stress, and sleep disturbance.  The ALJ finally noted that Dr. Voss opined that Ealey's mental impairments were non-severe and that Ealey "had no greater limitations or restrictions with activities of daily living, social functioning, or concentration, persistence and pace (or episodes of decompensation of an extended duration)."  Based on this review of the evidence, the ALJ stated, "Accordingly, the undersigned

finds the claimant's adjustment disorder (with symptoms of depression and anxiety) is a non-severe impairment."  R. 17.

At Step 3, the ALJ concluded that Ealey's impairments did not meet or medically equal a Listing.  The ALJ considered several Listings including Listing 1.04 for disorders of the spine.  The ALJ stated:

> The medical evidence of record does not document any spinal abnormalities necessary to meet the requirements of Section 1.04 of the Listings, governing disorders of the spine. There is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively, as required by section 1.04.

R. 18.

The ALJ stated that he considered Ealey's obesity finding that Ealey did not meet a Listing.  R. 19.

At Step 4, the ALJ determined that Ealey had the RFC to perform light work except no more than frequent climbing of ladders, ropes, and scaffolds; and occasional overhead reaching with his dominant extremity. R. 19.  The ALJ relied, in part, on Ealey's post-surgery follow up examinations and accompanying x-rays that showed that Ealey's cervical spine was stable, successfully fused, and correctly aligned; that his pain ranged between 0/10 to 4/10; and that the August 2013 examination

showed normal range of motion, normal gait, normal strength, and the ability to get on and off the examination table.  The ALJ also relied on the opinions of state agency physicians Drs. Bitzer and Aquino.  R. 22.  The ALJ found that Dr. Pineda's ten pound lifting restriction in February 2013 was a temporary post-operative lifting limitation.  R. 22-23.

The ALJ found that Ealey's statements about the limitations due to his neck and hip impairments was not consistent with the other evidence in the record.  The ALJ also discounted Dr. Yap's opinions because his opinions were inconsistent with his own treatment records and the other objective medical evidence in the record, and his opinions were conclusory without explanation of the basis for the opinions.  R. 17-22, 23.

The ALJ found that Ealey's diabetes was generally well-controlled with medication and did not caused disabling functional limitations.  The ALJ relied on the examinations in Dr. Hoelzer's office that showed slowly improving control when Ealey took insulin as prescribed.  The ALJ also found that the treatment notes for Ealey's diabetes did not indicate that his retinopathy and peripheral neuropathy caused any functional limitations.  R. 21-22.

The ALJ found:

Due to the combined symptom and effects of claimant's diabetes, obesity, degenerative disc disease and residuals stats

post multiple cervical spine surgeries the claimant is limited to no more than frequent climbing of ropes, ladders, and scaffolds; and occasional overhead reaching with the dominant upper extremity.

R. 24.

The ALJ found at Step 4 that Ealey could not return to his past work as a plant operator.  R. 24.  The ALJ found at Step 5 that Ealey could perform a significant number of jobs that exist in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Lanier that a person of Ealey's age with his education, experience, and RFC could perform the representative jobs of collator operator, mail sorter, and routing clerk.  R. 25.  The ALJ concluded that Ealey was not disabled.

Ealey appealed the ALJ's decision.  On April 16, 2015, the Appeals Council denied Ealey's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Ealey then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).  As an initial matter, Ealey does not challenge the ALJ's determination to discount Ealey's statements about the limiting effects of his symptoms because the statements were not consistent with the other evidence in the record, and does not challenge the ALJ's determination to give Dr. Yap's opinions little weight.[2]  Those issues are, therefore, waived and will not be addressed in this opinion.  See e.g., Wachovia Securities, LLC v. Banco Panamericano, Inc., 674 F.3d 743, 758-59 (7th Cir. 2012).

The ALJ's decision is supported by substantial evidence.  The opinions of Dr. Voss and the examination notes cited by the ALJ supported his conclusion that Ealey's depression was non-severe.  The examination

---

[2] On the date that the ALJ issued his decision, the Social Security Administration instructed ALJs to make a determination of the credibility of statements about the limiting effects of symptoms in light of all of the evidence in the record.  SSR 96-7p.  On March 16, 2016, the Social Security Administration directed ALJs to evaluate statements along with all of the other evidence in the record to determine the limiting effects of symptoms, but not to use the term "credibility" and not to assess the overall character or truthfulness of an individual who made such statements.  SSR 16-3p.  Ealey did not challenge the ALJ's assessment of his statements about his symptoms in light of the record as a whole, and so, the Court does not reach the effect of SSR 16-3p on the outcome in this case.  The Court notes that the ALJ did not make a finding about Ealey's overall character or truthfulness.  R. 19-22, 24.

notes from Dr. Hoelzer's office support the conclusion that Ealey's diabetes could be controlled with medication, and also support the conclusion that Ealey's retinopathy and peripheral neuropathy did not cause any functional limitations.  The examination notes and x-rays after Ealey's January 2013 neck surgeries support the ALJ's determination that his cervical spine caused some limitations reflected in his RFC.  The opinions of Drs. Blitzer and Aquino also supported the ALJ's RFC determination.  The RFC determination and the opinions of vocational expert Lanier supported the ALJ's determinations at Steps 4 and 5 that Ealey could not perform his prior relevant work, but could perform a substantial number of jobs in the national economy.  The decision is supported by substantial evidence.

Ealey argues that the ALJ failed to assess Ealey's cervical condition adequately.  Ealey argues that the December 2012 MRI was not submitted to medical scrutiny.  The Court disagrees.  The record contains radiologist Dr. Baima's reading of the MRI and Dr. Pineda's interpretation of the MRI. R. 591-93, 703.  The ALJ was not required to seek additional medical opinions in light of these two opinions in the record.  Furthermore, that MRI reflected Ealey's condition before the 2013 surgeries.  The ALJ properly evaluated Ealey's limitations after the 2013 cervical surgeries.  See 20 C.F.R. § 404.1530; Wurst v. Colvin, 520 F. App'x 485, 488 (7th Cir. 2013)

(The ALJ properly evaluated the claimant's ability to ambulate after his knee replacement surgery).

Ealey argues that the ALJ failed to adequately explain his determination that Ealey's impairments or combination of impairments did not meet or equal Listing 1.04 for disorders of the spine.  The Court again disagrees.  Listing 1.04 requires a spinal condition that results in compromise of a nerve root or spinal cord with one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpart P, App. 1, Listing 1.04.  The ALJ correctly noted that the evidence did not support a finding of any of the three

conditions listed in 1.04 A, B, or C.  Ealey cites the decision in <u>Minnick v.</u>

<u>Colvin</u>, 775 F.3d 929, 936 (7th Cir. 2015) for the proposition that a

perfunctory analysis is inadequate to dismiss an impairment as meeting or

not meeting a Listing.  In <u>Minnick</u>, however, evidence in the record could

have supported a finding that the claimant's impairments equaled a Listing.

<u>Id.</u>, at 936.  No such evidence exists in this case, particularly after the 2013

surgeries.  The Court finds no error in the ALJ's analysis of Listing 1.04 in

this case.

Ealey argues that the ALJ erred in finding that his depression was

non-severe.  A mental impairment is non-severe if it does not significantly

limit the claimant's mental abilities to do basic work activities.  20 C.F.R. §

404.1521.  Ealey bases this argument on Dr. Trello's assignment of a GAF

score of 50.  A GAF is a measure of a clinician's judgment as to the

individual's overall level of functioning or the severity of the individual's

symptoms.  American Psychiatric Association, <u>Diagnostic and Statistical</u>

<u>Manual of Mental Disorders (4th ed. Text Revision 2000)</u>, at 32-34.[3]  A GAF

score of 50 indicates either serious symptoms or serious functional

limitations.  <u>Id.</u>, at 34.

---

[3] The American Psychiatric Association no longer recommends the use of the GAF score.  American
Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)</u>, at
16.  The ALJ, however, did not question the validity of GAF scores in his decision.

The ALJ acknowledged the GAF score, but also noted other evidence that showed that Ealey had no material function limitations due to his depression:  several medical examinations were negative for crying spells, stress, or sleep disturbance; Dr. Trello found that Ealey had intact immediate, recent, and remote memory and did well on simple numerical testing; and Dr. Voss opined that Ealey's mental impairments were non-severe and did not affect daily living, social functioning, concentration, persistence, or pace.   The ALJ also noted that Ealey reported his depression was getting better in October of 2012, and he was negative for anxiety, crying spells, feelings of stress, and sleep disturbance.  The ALJ further noted similar findings were recorded on January 16, 2013.  R. 17.  The ALJ weighed all this evidence and concluded that Ealey's mental impairments were non-severe.  A reasonable mind might accept this other evidence cited by the ALJ as sufficient to support the conclusion that Ealey's mental impairments did not limit his ability to do basic work activities.  The decision, therefore, was supported by substantial evidence.  See Richardson, 402 U.S. at 401.

Ealey argues that the ALJ failed to build a logical bridge from the evidence to his conclusion regarding Ealey's depression.  The Court disagrees.  The ALJ sufficiently explained his reasoning to enable the Court

to track the analysis.  See Green v. Shalala, 51 F.3d 96, 101(7th Cir. 1995).

The ALJ set out the relevant evidence and, after reviewing and weighing

the evidence, determined that the depression was non-severe.  R. 17.

Ealey also argues that Dr. Voss did not have an adequate basis for

his opinion because he did not review Dr. Trello's mental status

examination.  That is incorrect.  Dr. Voss considered Dr. Trello's report in

formulating his opinion that the depression was non-severe.  Dr. Voss

relied on the finding in the mental status examination that showed that

Ealey's memory and concentration were within normal limits.  R. 80-81.

The ALJ's finding that depression was non-severe did not constitute

reversible error.

Ealey argues that the ALJ failed to consider Ealey's obesity.  The

Court disagrees.  The ALJ specifically considered Ealey's obesity.  R. 19,

24.  Further, Ealey must articulate how his obesity limited his functioning

and exacerbated his impairments.  See Hisle v. Astrue, 258 F. App'x 33, at

37 (7th Cir. 2007).  Ealey has failed to cite any evidence that indicates that

his obesity affected his functional limitations.  The Court should not reverse

on mere speculation that a revision of the ALJ's consideration of Ealey's

obesity would affect the outcome of this decision.

Ealey finally argues that the ALJ erred because he failed to incorporate all of Ealey's impairments into the hypothetical questions he asked the vocational expert.  Ealey argues that the ALJ should have incorporated into the questions a need to change periodically from a sitting to a standing position during the workday (a sit/stand option), and limitations due to fatigue, headaches, and neuropathy.

The Court again disagrees.  The ALJ was required to incorporate into his hypothetical question Ealey's functional limitations caused by his medically determined impairments or combination of impairments.  <u>See Yurt v. Colvin</u>, 758 F.3d 850, 857 (7th Cir. 2014).  The ALJ was not required to incorporate all symptoms or impairments, only the functional limitations that resulted from those impairments.  No evidence, medical or otherwise, indicated that fatigue or headaches limited Ealey's functional abilities.  The ALJ specifically found that Ealey's neuropathy did not cause any functional limitations.  R. 21, 22.  That finding was supported by the medical evidence.  Ealey's arguments to the contrary are not persuasive.  Ealey's testimony and Dr. Yap's opinions were the only evidence that Ealey needed a sit/stand option.  The ALJ discounted Ealey's statements and Dr. Yap's opinions, and Ealey did not challenge those determinations in this appeal.  Furthermore, the opinions of Drs. Bitzer and Aquino described

above supported the conclusion that Ealey did not need a sit/stand option. The ALJ, therefore, did not err in omitting a sit/stand option in the hypothetical questions.

The ALJ set forth his determination of Ealey's functional limitations in his RFC determination.  As explained above, the RFC determination was supported by substantial evidence.  The hypothetical questions to the vocational expert incorporated all the functional limitations reflected in the RFC.  The hypothetical questions were proper.  There was no error.

THEREFORE, THIS COURT RECOMMENDS that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 19) should be ALLOWED, Plaintiff Jerry Lynn Ealey's Motion for Summary Judgment or Remand (d/e 15) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   July 28, 2016

_____s/ Tom Schanzle-Haskins_____
UNITED STATES MAGISTRATE JUDGE