## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **JERRY L. EALEY, SR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15-cv-3146** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before this Court are cross-motions for summary judgment (d/e 15, 19), the Report and Recommendation of United States Magistrate Judge Tom Schanzle-Haskins (d/e 23), and Plaintiff's Objections to the Report and Recommendation (d/e 24).

Upon careful review of the record and the pleadings, the Court OVERRULES the Plaintiff's Objections because the ALJ's decision is supported by substantial evidence.  Accordingly, the Court ACCEPTS and ADOPTS the Report and Recommendation (d/e 16). The Commissioner's Motion for Summary Affirmance (d/e 19) is

GRANTED.  The Plaintiff's Motion for Summary Judgment (d/e 15) is DENIED.  This decision of the Commissioner is AFFIRMED.

## I. BACKGROUND

Plaintiff Jerry L. Ealey, Sr. was born on May 18, 1959.  He has a high school education and previously worked as a plant operator. Plaintiff alleges that he became disabled on December 1, 2011. R. 14, 58-60, 67.  He suffers from diabetes, obesity, degenerative disc disease, status post cervical spine surgery, and depression.  R. 16-17.

On January 31, 2011, Plaintiff saw orthopedic surgeon Dr. Stephen Pineda because of pain in Plaintiff's neck and shoulders. An MRI reviewed by Dr. Pineda showed that Plaintiff had degenerative changes in his cervical spine at C4-5, C5-6, C6-7, and to a lesser degree C3-4.  Dr. Pineda stated that these changes had caused spinal stenosis.  Dr. Pineda recommended surgery, but Plaintiff did not undergo the surgery at that time.  R. 384.

On February 7, 2011, Plaintiff saw chiropractor Dr. John L. Kain, complaining of neck and arm pain, his left hand going to sleep, headaches, and trouble lifting his right arm.  Dr. Kain found that Plaintiff's range of motion in the cervical, thoracic, and lumbar

spine was moderately restricted by pain.  Dr. Kain also noted moderate spasm and tenderness on palpitation of the cervical and thoracic spine.  A leg drop test was positive for lower back pain, and a foraminal compression test was positive for neck pain.  However, strength in all extremities was 5/5.  Dr. Kain assessed cervicobrachial syndrome with myospasm and lumbar facet syndrome.  Dr. Kain also stated that a June 25, 2010 MRI showed severe spinal stenosis with cord compression at C4-5-6-7.  R. 406. Plaintiff saw Dr. Kain again on August 12, 2011.  Dr. Kain confirmed his prior assessments but added that straight leg tests were negative.  R. 408.

On November 7, 2011, Plaintiff saw Dr. David Hoelzer for an endocrine follow-up.  Dr. Hoelzer stated that Plaintiff had diabetic peripheral neuropathy and diabetic retinopathy.  Plaintiff reported stable numbness in his feet and toes and stable vision.  Dr. Hoelzer assessed Type 2 diabetes with slowly improving control.  Dr. Hoelzer continued Plaintiff's insulin medication, discussed diet and exercise with Plaintiff, and advised Plaintiff to report the results of his home glucose readings.  R. 360-62.

On the same date, Plaintiff saw Dr. Pineda, complaining of neck and shoulder pain.  Dr. Pineda stated that an EMG study was descriptive of right radiculopathy and right carpal tunnel syndrome. Plaintiff denied numbness issues and, upon examination, Dr. Pineda found that Plaintiff's "deltoid, biceps, triceps, wrist flexors and extensors, finger flexors and extensors, and everything fires well." R. 364.  Dr. Pineda found that Plaintiff did not require immediate surgery.

On January 25, 2012, Plaintiff saw his primary care physician, Dr. Dennis Yap, for a follow-up on an emergency room visit for swelling in Plaintiff's leg.  Plaintiff appeared disheveled and in moderate pain.  His Body Mass Index was 35.7 and he walked with a left leg limp.  Dr. Yap assessed cellulitis of the left leg.  Dr. Yap refilled Plaintiff's prescription for clindamycin and advised Plaintiff to keep his leg elevated, to wear thigh high compression stockings, and to stop smoking.  R. 428-29.

On March 8, 2012, Plaintiff saw Dr. Hoelzer.  Plaintiff reported glucose readings in the mid to upper 100s and numbness in his feet and toes but no significant pain.  Plaintiff reported no change in his diabetic retinopathy.  Upon examination, Dr. Hoelzer found a cyst

in Plaintiff's skin over his left Achilles tendon.  However Plaintiff had no peripheral edema or lesions.  Plaintiff had mildly diminished sensation in his toes.  Plaintiff's A1c reading of his blood glucose level was 7.8%.  Dr. Hoelzer noted that the reading had slowly decreased over time.  Dr. Hoelzer assessed Type 2 diabetes mellitus with gradually improving control.  R. 357-59.

On April 3, 2012, Plaintiff had an MRI of his left ankle.  The MRI showed marked advanced diffuse tendinopathy and swelling in the left Achilles tendon, as well as a partial tear in the posterior fibers of the tendon.  R. 401-02.

On April 10, 2012, Plaintiff saw podiatrist Dr. Timothy Graham, for a follow-up on his ankle.  Plaintiff reported a pain level of 5/10.  Dr. Graham noted mild decrease in range of motion of the left ankle and prescribed a walking boot to be used whenever Plaintiff walked.  R. 613-14.

On May 20, 2012, Plaintiff saw Dr. Yap for vertigo.  Dr. Yap found mild fatigue, dizziness, headaches, and vertigo.  Dr. Yap advised Plaintiff to control his sugar tightly and recommended weight loss, a low-calorie diet, and daily exercise.  R. 436.

On May 22, 2012, Plaintiff saw Dr. Graham and reported no pain in his left Achilles tendon.  Dr. Graham found considerable improvement but observed a mild decrease in range of motion.  R. 611-12.

On June 28, 2012, state agency physician Dr. David Bitzer prepared a Physical Residual Functional Capacity Assessment.  Dr. Bitzer opined that Plaintiff could: (1) occasionally lift twenty pounds and frequently lift 10 pounds; (2) stand and/or walk for six hours in an eight-hour workday and sit for more than six hours in an eight-hour workday; and (3) frequently climb ladders, ropes, and scaffolds.  Dr. Bitzer found no other functional limitations.  R. 71-72.

On July 12, 2012, Plaintiff saw Nurse Practitioner Pamela Brodt in Dr. Hoelzer's office.  Plaintiff reported not taking insulin due to cost, missing most of his NovoLog doses regardless of whether he had insulin, and blood sugar readings in the 200s.  Plaintiff's A1c was 11%.  Brodt stated that Plaintiff had peripheral neuropathy with decreased sensation in both big toes but that Plaintiff had no edema and retained movement in all extremities.  Brodt found decreased sensation to fine monofilament touch in

both big toes.  Brodt also found that Plaintiff had a normal mood and affect.  Brodt assessed diabetes mellitus poorly controlled and advised Plaintiff to report home glucose readings.  R. 491-93.

On September 11, 2012, Plaintiff saw Dr. Hoelzer.  Plaintiff had not reported any blood sugar readings since his last visit, but the readings in his monitor for the prior 60 days averaged 161. Plaintiff reported a tendency toward "easy fatigability."  Dr. Hoelzer assessed peripheral neuropathy with chronic numbness in his feet and toes, but he assessed no significant neuropathic pain or focal weakness.  On examination, Dr. Hoelzer found diminished sensation in the toes.  Dr. Hoelzer assessed poorly controlled Type 2 diabetes mellitus.  R. 488-90.

On September 21, 2012, Plaintiff saw Dr. Yap for back pain and depression.  Plaintiff reported arthralgia, back pain, joint stiffness, bilateral leg pain, myalgia, and depression with feelings of sadness and stress but no difficulty concentrating, no sleep disturbance, and no suicidal thoughts.  On examination, Dr. Yap found normal range of motion, strength, and tone.  Dr. Yap assessed depression, neuropathic pain, and pitting edema.  Dr. Yap prescribed Prozac for the depression.  R. 509-12.

On October 5, 2012, Plaintiff saw Dr. Yap.  Plaintiff's BMI was 35.3.  Plaintiff reported that his depression was getting better.  Dr. Yap found paresthesia in both lower extremities, and pain with range of motion in Plaintiff's back.  Dr. Yap also found depression and sadness but no anxiety, sleep disturbance, or suicidal thoughts.  Dr. Yap continued Plaintiff's Prozac prescription.  R. 506-08.

On November 12, 2012, Plaintiff saw state agency psychologist Dr. Delores Trello for a mental status examination.  Dr. Trello found that Plaintiff had a normal affect; he was oriented; and his immediate; recent; and remote memory was intact.  Plaintiff reported that he bathed himself, sometimes cooked, did laundry, drove around town, and went grocery shopping with his wife.  Dr. Trello assessed depression, anxious mood associated with chronic pain and medical conditions, and adjustment disorder with depressed, anxious mood.  Dr. Trello assigned a Global Assessment of Functioning (GAF) score of 50, indicating serious impairment in vocational functioning.  R. 534-37.

On November 13, 2012, Plaintiff saw Dr. Kain.  Plaintiff reported lower back pain, bilateral buttock burning pain, and

stiffness.  Dr. Kain assessed lumbar facet syndrome with myospasm.  R. 556.

On November 24, 2012, state agency psychologist Dr. David Voss prepared a Psychiatric Review Technique assessment of Plaintiff.  Dr. Voss opined that Plaintiff's mental impairments caused mild restrictions on activity of daily living, mild restrictions on social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated periods of decompensation.  Dr. Voss noted that the mental-status examination showed memory and concentration within normal limits.  As a result, Dr. Voss opined that Plaintiff's mental impairments were non-severe.  R. 80-81.

On November 27, 2012, state agency physician Calixto Aquino prepared a Physical Residual Functional Capacity Assessment.  Dr. Aquino's opinion on Plaintiffs residual functional capacity was identical to that of Dr. Bitzer's previous assessment.  R. 82-84.

On December 14, 2012, Plaintiff underwent a cervical MRI ordered by Dr. Pineda.  Radiologist Dr. Joseph Baima found that "osseous structures are normal in alignment and signal characteristics.  The cord is normal in position and signal

characteristics." However, Dr. Baima stated that Plaintiff had severe canal and bilateral foraminal stenosis from C4-5 through C6-7 with moderate canal and severe bilateral foraminal stenosis at C3-4. R. 703. On December 17, 2012, based on the same MRI, Dr. Pineda found multilevel cervical spondylosis with probable osteophyte disc complex at C4-5-6-7. Dr. Pineda stated that there was both anterior and posterior decompression. Plaintiff reported some pain and burning into his upper extremity. Dr. Pineda recommended surgery on Plaintiff's cervical spine and ordered another x-ray. The x-ray showed mild to moderate disc space narrowing at C4-5-6-7. R. 723.

On January 4, 2013, Plaintiff saw Dr. Yap for a preoperative examination. Plaintiff complained of back pain, joint stiffness, myalgia, anxiety, depression, and sadness. Plaintiff denied crying spells, feelings of stress, sleep disturbance, or suicidal thoughts. R. 725. On examination, Plaintiff's BMI was 35.1. Plaintiff had full range of motion in his neck and normal range of motion in other joints, normal strength, and normal tone. Plaintiff had appropriate affect, normal speech, and grossly normal memory. R. 726-27.

On January 10, 2013, Dr. Pineda performed anterior surgery on Plaintiff's cervical spine, and on January 31, 2012, Dr. Pineda performed posterior surgery on Plaintiff's cervical spine.  R. 584, 684-87, 708.  On February 18, 2013, Plaintiff reported pain of 0/10 to Dr. Pineda.  Dr. Pineda removed Plaintiff's stitches and told Plaintiff to "limit his lifting to 10 pounds or so."  R. 682-83.

On February 21, 2013, a cervical x-ray showed a posterior cervical fusion from C3-4-5-6-7 without evidence of hardware complications and a stable anterior cervical fusion.  R. 716.

On March 18, 2013, Plaintiff saw Dr. Pineda for a surgical follow-up and Dr. Pineda assessed post-anterior cervical fusion six weeks currently doing well.  Plaintiff had no numbness or weakness in his arms or legs.  R. 581.  An x-ray showed the appearance of a stable post-operative cervical spine.  R. 701.

On April 1, 2013, Plaintiff saw Nurse Practitioner Jennifer Jenkins in Dr. Pineda's office.  Plaintiff rated his pain 4/10. Plaintiff was healing from the surgery but complained of some drainage and "stiffness in his neck as the day wears on."  Jenkins prescribed Keflex for the drainage and ibuprofen and Aleve for the stiffness.  R. 641.

On April 22, 2013, at a follow-up incision check, Dr. Pineda found that Plaintiff was doing pretty well.  Plaintiff rated his pain 3/10.  R. 674.  On May 20, 2013, Plaintiff rated his pain 2/10 and Dr. Pineda stated that Plaintiff was "currently doing real nicely." On examination, Dr. Pineda found that Plaintiff's hip, knee, and ankle joints were firing, his sensation was intact, his incision was clean and dry, and he had no problems with speech or voice.  Dr. Pineda also stated that Plaintiff's x-rays demonstrated good alignment.  R. 648-49.

On July 9, 2013, Plaintiff saw Dr. Yap and complained of hip pain.  Plaintiff reported arthralgia, joint stiffness, and myalgia but was negative for limb pain.  On examination, Plaintiff weighed 270 pounds and his BMI was 34.7.  Plaintiff walked with a limp and had pain with range of motion in his hip.  Urinalysis showed hematuria and proteinuria.  Dr. Yap assessed hip pain, myalgia, and gross hematuria.  Dr. Yap prescribed Vicodin and Flexeril.  R. 560-61.

On June 10, 2013, Plaintiff saw Dr. Hoelzer.  Plaintiff reported that he had not been tightly controlling his diabetes.  Plaintiff reported blood sugar readings between 200 and 500.  Plaintiff reported that he had back surgery and no longer needed a cervical

collar.  He reported improved but still present pain.  Dr. Hoelzer
assessed Type 2 diabetes with suboptimal control.  R. 654-55.

On July 9, 2013, Plaintiff saw Dr. Yap.  Plaintiff complained of
hip pain and walked with a limp.  On examination, Plaintiff had
pain in his hips bilaterally with range of motion.  R. 559-61.  X-rays
showed no fracture or subluxation, joint space was maintained, and
clips along the medial left thigh.  The radiologist made no osseous
findings.  R. 634.

On August 21, 2013, Plaintiff saw Nurse Practitioner Susan
Nelson in Dr. Pineda's office complaining of pain in passing kidney
stones.  On examination, Plaintiff had normal strength and range of
motion, normal gait, and "was able to get on and off the exam table
independently."  R. 650-51.  An x-ray showed an ovoid calcification
in the expected region of the left renal pelvis.  R. 652-53.

On September 10, 2013, Plaintiff saw Dr. Hoelzer.  Plaintiff's
home blood sugar readings averaged over 250 for the past two
weeks.  Plaintiff also had peripheral neuropathy with numbness in
his feet and toes.  Dr. Hoelzer noted that Plaintiff was making a
reasonable recovery from his surgeries but Plaintiff had some easy

fatigability.  Dr. Hoelzer assessed Type 2 diabetes mellitus with poor control.  R. 658-59.

On September 24, 2013, Dr. Yap completed a Medical Source Statement Ability To Do Work-Related Activities form.  Dr. Yap opined that Plaintiff could: (1) occasionally lift ten to fifty pounds but could not frequently or continuously lift any amount of weight; (2) sit, stand, and walk for fifteen minutes at a time without interruption and for a total of fifteen minutes in an eight-hour workday; (3) walk without a cane; and (4) reach, handle, and finger occasionally; (5) occasionally climb stairs and ramps, stoop, and kneel but never could never crouch, crawl, or climb ropes, ladders, or scaffolds.  R. 594-99.

On October 22, 2013, the Administrative Law Judge (ALJ) held an evidentiary hearing.  R. 32-66.  Plaintiff appeared in person with his attorney.  Vocational expert James Lanier also appeared.  R. 34.

At the hearing, Plaintiff testified to the following:

Plaintiff lived in a mobile home with his wife and adult daughter, and his adult son lived in an apartment behind the home. Plaintiff graduated from high school.  R. 37, 39.  Plaintiff formerly worked for a sand and gravel company as a plant operator, where

he checked conveyor belts and other equipment to make sure it was operating properly.  The job also involved climbing stairs and ladders but it was not a supervisory position.  R. 59.  Plaintiff stopped working in November 2011.  After eighteen years, he was let go "for medical reasons."  Plaintiff could no longer swing a hammer, as required to maintain equipment.  R. 58-59.

Plaintiff earned $1,713 in 2012 working for a farmer three or four days per week.  R. 40.  He mainly worked during planting and harvesting.  R. 60.  Plaintiff stopped working for the farmer because he could not "turn [his] head around to back the tractors and equipment up into the corner of the field."  R. 40.

Plaintiff was taking a generic version of Prozac on a daily basis.  He had been taking it for three to four years.  The medication helped Plaintiff's mood.  R. 41.  Plaintiff cried two to three times per week, but he did not know why.  R. 57-58.  Plaintiff had a driver's license and had driven the day before the hearing.  He drove approximately 50 miles per week.  R. 44.

Plaintiff has problems with his neck.  His recovery from surgery was "not good."  He could not turn his neck, "release his head and look up," or bend over.  Plaintiff had pain all of the time,

rated at 2/10.  The pain increased if he moved his head or looked up or down.  R. 47-48.

Plaintiff could walk for fifteen minutes at one time and then his hips hurt too badly to continue.  R. 48.  However, he was not being treated for hip pain because he still had to "go back to the doctor to have him look at it."  R. 49.  Lifting more than three to five pounds made Plaintiff's pain much worse.  He also felt pain from lifting his neck and shoulders.  He took a generic form of Vicodin for the pain if he was doing something "more strenuous."  R. 49-50. Nothing else caused him pain in his neck.  R. 49-50.

Plaintiff could sit for thirty minutes at a time but then his hips would start hurting and so he would have to stand.  However, he could not stand in one place because of his pain.  R. 51.  Plaintiff originally testified that he could not reach over his head but the ALJ asked Plaintiff to raise his arms and Plaintiff complied.  However, Plaintiff did not know how long he could hold his arms in that position.  R. 52.  Plaintiff could not bend over without holding onto something to get back up but had no problem climbing stairs.  R. 53.

Plaintiff did not do any chores.  He went to the grocery store with his wife once every two months.  He pushed the grocery cart until he got tired and then had to sit down.  Plaintiff could cook himself lunch or breakfast but not a big meal.  R. 54-55.  The day before the hearing, Plaintiff ate a piece of toast, drank a glass of juice, and sat and watched television until 11:00 a.m.; went outside for a walk; made a bologna sandwich for lunch; let the dogs outside into a pen and brought them back inside; sat and watched television for an hour; went for a walk; and watched television until dinner time.  Such a day was typical of Plaintiff's routine.  R. 55-56.

Plaintiff stopped hunting because of his problems.  He did not go out much.  He did not go to church.  He socialized with family members in his home.  He went out to eat once per month.  R. 57.

After Plaintiff's testimony, the ALJ asked the vocational expert, Mr. Lanier, what jobs were available to an individual similarly situated to Plaintiff in age and qualification, who is limited to light work; use of ladders, ropes, or scaffolds only frequently; and limited to overhead reaching only occasionally with the dominant extremity. R. 63.  Mr. Lanier testified that such an individual could not perform Plaintiff's past work; however, the individual could perform

the jobs of collator operator (3,700 jobs in Illinois and 51,000

nationally), mail sorter (1,200 jobs in Illinois and 32,000

nationally), and routing clerk (1,700 jobs in Illinois and 112,000

nationally).  Mr. Lanier opined that these jobs were representative of

the jobs that such a person could perform and not an exhaustive

list.  R. 63.  Mr. Lanier further testified that such a person could

not maintain employment if he missed four or more days of work

per month or if he took an extra rest break periodically.

The ALJ issued his decision on November 21, 2013.  The ALJ

followed the five-step analysis set forth in 20 C.F.R. §§ 404.1520,

416.920.  Step 1 requires that the claimant not currently be

engaged in substantial gainful activity.  Id.  Step 2 requires that the

claimant have a severe impairment.  Id.  Step 3 requires the ALJ to

determine whether the claimant is so severely impaired so as to be

disabled regardless of age, education, and work experience.  Id.

Plaintiff must pass the first two steps to reach the third.  If Plaintiff

passes the third step, he is disabled.  If not, Step 4 requires that

Plaintiff not be able to return to his past work.  Id.  If Plaintiff

passes Step 4, then Step 5 requires the ALJ to assess Plaintiff's

residual functional capacity and determine if Plaintiff can perform

some type of gainful employment that exists in the national

economy.  Id.  Plaintiff has the burden of proof at each of Steps 1-4.

However, at Step 5, the Commissioner has the burden to prove that

Plaintiff can perform gainful employment.  Weatherbee v. Astrue,

649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v.

Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Plaintiff had not engaged in gainful

activity since the onset date and that Plaintiff had severe

impairments of diabetes, obesity, degenerative disc disease, and

residual status post multiple spine surgeries.  R. 16.

However, the ALJ determined that Plaintiff's depression was

not a severe impairment.  The ALJ noted that Plaintiff has never

seen a specialist for his mental health issues and only received a

prescription from his primary care physician.  Further, although

Dr. Trello gave him a GAF score of 50, Plaintiff reported being able

to take care of his personal needs.  Also, Dr. Trello found Plaintiff's

memory intact, and Plaintiff had normal mood and affect in his

mental examinations on November 1, 2012 and January 4, 2013.

The ALJ noted that Plaintiff reported that his depression was better

in October 2012 and that that examination and his January 4,

2013 examination were negative for anxiety, crying spells, feelings
of stress, and sleep disturbance.  The ALJ last noted that Dr. Voss
opined that Plaintiff's mental impairments were non-severe because
Plaintiff had only mild limitations on daily living activities, social
functioning, and concentration, persistence, and pace, and Plaintiff
had no episodes of decompensation.  R. 17.

At Step 3, the ALJ found that Plaintiff's impairments did not
meet or medically equal any Listing and, therefore, the ALJ did not
find Plaintiff disabled regardless of age, education, or work
experience.  Specifically, the ALJ found that Plaintiff's spine
disorder did not meet Listing 1.04 because the medical evidence
does not show evidence of any of the governing disorders.  That is,
"[t]here is no evidence of nerve root compression characterized by
neuro-anatomic distribution of pain, limitation of motion of the
spine, motor loss accompanied by sensory or reflex loss and positive
straight-leg raising test; spinal arachnoiditis; or lumbar spinal
stenosis resulting in pseudoclaudification with inability to ambulate
effectively."  R. 18.  The ALJ also stated that Plaintiff's obesity did
not meet a Listing.  R. 19.

At Step 4, the ALJ found that Plaintiff had the residual functional capacity to perform light work, except Plaintiff could climb ladders, ropes, and scaffolds no more than frequently and could reach overhead with his right arm only occasionally.  R. 19. The ALJ relied, in part, on Plaintiff's post-surgery follow-up examinations and x-rays, which showed that: Plaintiff's spine was stable, successfully fused, and correctly aligned and that his pain ranged between 0/10 and 4/10.  The ALJ relied specifically on Plaintiff's August 2013 examination, which showed normal range of motion, normal gait, normal strength, and the ability to get on and off the examination table independently.  The ALJ also relied on the opinions of state agency physicians Dr. Bitzer and Dr. Aquino.  R. 22.  Additionally, the ALJ found that Dr. Pineda's advice to Plaintiff in February 2013—to limit lifting to ten pounds or so—was only a temporary, post-operative lifting limitation.  R. 22-23.

The ALJ found that Plaintiff's testimony about his limitations from hip and neck impairments was not consistent with other evidence in the record.  The ALJ discounted Dr. Yap's opinions of September 2013 regarding Plaintiff's limitations because the

opinions were inconsistent with Dr. Yap's own treatment records and the basis of the opinions was not explained.  R. 17-23.

The ALJ found that Plaintiff's diabetes was reasonably well controlled with medication and did not cause disabling functional limitations based on Dr. Hoelzer's examinations.  The ALJ noted that the examinations showed that control slowly improved when Plaintiff took his insulin as prescribed.  The ALJ found that the treatment for Plaintiff's retinopathy and peripheral neuropathy did not indicate that Plaintiff had any functional limitations from the disorders.

Based on "the combined symptom and effects of [Plaintiff's] diabetes, obesity, degenerative disc disease, and residual stats post multiple cervical spine surgeries," the ALJ found that Plaintiff could do light work with the exceptions of climbing ropes, ladders, or scaffolds more than frequently and reaching overhead with his right arm more than occasionally.  R. 24.

As a result, the ALJ found that Plaintiff could not return to his past work.  R. 24.  However, at Step 5, the ALJ found, based on the testimony of Mr. Lanier and the Medical-Vocational Guidelines (20 C.F.R. Part 404, Subpart P, Appendix 2), that Plaintiff could

perform the representative jobs of collator operator, mail sorter, and routing clerk.  R. 25.  Further, the ALJ found that these jobs exist in sufficient number in the national economy.  As a result, the ALJ found that Plaintiff was not disabled.

Plaintiff appealed the ALJ's decision, but on April 16, 2015, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  R. 1. Plaintiff then appealed the Commissioner's decision to this Court. The Court referred the parties' cross-motions for summary judgment (d/e 15, 19) to U.S. Magistrate Judge Schanzle-Haskins for a Report and Recommendation.

On July 28, 2016, Judge Schanzle-Haskins issued his Report and Recommendation (d/e 23), recommending that this Court deny Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary affirmance, and affirm the decision of the Commissioner because the ALJ's findings are supported by substantial evidence.  Specifically, Judge Schanzle-Haskins found that: (1) the opinions of Dr. Voss and the mental examination notes cited by the ALJ support the ALJ's finding that Plaintiff's depression was non-severe; (2) the examination notes of Dr. Hoelzer's office

support the ALJ's finding that Plaintiff's diabetes could be
controlled with medication and Plaintiff's retinopathy and
peripheral neuropathy did not cause functional limitations; (3) the
ALJ properly assessed Plaintiff's cervical condition based on his
2013 post-operative examinations and x-rays, and those
examinations, along with the opinions of Dr. Bitzer and Dr. Aquino
supported the ALJ's residual functional capacity findings; (4) the
ALJ sufficiently explained his finding that Plaintiff's cervical issues
did not meet Listing 1.04; (5) the ALJ properly considered Plaintiff's
obesity in combination with Plaintiff's other impairments; and (6)
the ALJ did not err by failing to include some of Plaintiff's
impairments into the hypothetical question posed to the vocational
expert.

On August 11, 2016, Plaintiff filed objections to Judge
Schanzle-Haskins' Report and Recommendation (d/e 24).

The Court now OVERRULES Plaintiff's objections, and the
Court ACCEPTS and ADOPTS Judge Schanzle-Haskins' Report and
Recommendation in its entirety.

## II. LEGAL STANDARD

This Court may "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b)(3). The Court's standard of review for a magistrate judge's report and recommendation depends upon whether a party objects. Portions of the report and recommendation to which no proper objection is made are reviewed for clear error. See Reed v. Commissioner of Social Security, 13-3426, 2015 WL 4484141, *1 (C.D. Ill. July 22, 2015) (citing Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999)). Portions of the report and recommendation to which a proper objection is made are reviewed de novo. See Fed.R.Civ.P. 72(b)(3).

In the Court's de novo review of the ALJ's decision, the standard of review for the ALJ's findings is substantial evidence. Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate'" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The standard of review for procedural errors is harmless error, or whether the error is such that the Court believes it may change the

ALJ's ultimate decision.  <u>McKinzey v. Astrue</u>, 641 F.3d 884, 892

(7th Cir. 2011) ("[A]dministrative error may be harmless: we will not

remand a case to the ALJ for further specification where we are

convinced that the ALJ will reach the same result.")

### III. ANALYSIS

Plaintiff objects to three of Judge Schanzle-Haskins' findings:

(1) that the ALJ properly considered whether Plaintiff's cervical

issues met Listing 1.04; (2) that the ALJ did not need an updated

medical opinion regarding Plaintiff's cervical issues; and (3) that the

ALJ properly considered Plaintiff's obesity in combination with

Plaintiff's other impairments.  The Court reviews the objected-to

findings <u>de</u> <u>novo</u> and reviews the rest of Judge Schanzle-Haskins'

findings for clear error.

### a. __The ALJ Properly Considered Whether Plaintiff's Cervical Issues Met Listing 1.04.__

### 1. *The ALJ's determination is supported by substantial evidence.*

Plaintiff first objects to Judge Schanzle-Haskins' finding that

the ALJ properly assessed at Step 3 whether Plaintiff's cervical

issues meet Listing 1.04.  The Court finds that the ALJ's decision is

supported by substantial evidence.

At Step 3, the ALJ must determine whether Plaintiff's impairments meet or are equal to the criteria of the impairments specified in one of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The relevant listing here is 1.04.  Listing 1.04 requires a spinal condition that results in a compromise of a nerve root or spinal cord with one of the following:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudification established by findings on appropriate medically acceptable

imaging, manifested by chronic nonradicular pain and

weakness, and resulting in inability to ambulate effectively,

as defined in 1.00B2b.

Whether Plaintiff's impairment meets Listing 1.04 is

determined from the medical evidence *after* Plaintiff's two surgeries

in 2013.  See Wurst v. Colvin, 520 Fed.Appx. 485, 488 (7th Cir.

2013) (evaluating whether the plaintiff's knee impairment met

Listing 1.02 or 1.03 based on the medical evidence after the

plaintiff's knee surgery).  Dr. Pineda performed two spinal surgeries

on Plaintiff in January 2013.  After the surgery, the medical records

show follow-up visits on February 18, February 21, March 18, April

1, April 22, and May 20 of 2013.  The visits on February 21, March

18, and May 20 included x-rays of Plaintiff's spine.  Plaintiff's

follow-up visits and x-rays and Dr. Pineda's statements show that

Plaintiff's spinal condition was stable after surgery.  See R. 682-83

(Plaintiff reported pain of 0/10 on February 18); R. 716 (Plaintiff's

February 21 x-ray showed posterior cervical fusion without

hardware complications and stable anterior cervical fusion); R. 581

(on March 18, Dr. Pineda assessed Plaintiff's cervical fusion as

doing well and x-rays showed a stable post-operative cervical spine);

R. 674 (on April 22, Dr. Pineda stated that Plaintiff was "doing pretty well"); R. 648-49 (on May 20, Dr. Pineda stated that Plaintiff was "currently doing real nicely"; found that Plaintiff's hip, knee, and ankle joints were firing and his sensation was intact; and x-rays showed good alignment). These medical records of the post-operative state of Plaintiff's cervical spine support the ALJ's finding that Plaintiff did not have an impairment that matches or equals the impairments in Listing 1.04.

Plaintiff points to some pre-surgery evidence that he claims support a finding that his impairments meet the listing. Specifically, Plaintiff mentions chiropractor Dr. Kain's February 2011 assessment of cervicobrachial syndrome with myospasm, lumbar facet syndrome, and severe spinal stenosis with cord compression, as well as a positive leg drop. R. 406. Even assuming that pre-surgery medical records could be considered, the evidence in the record still does not support a finding that Plaintiff cervical disorder met Listing 1.04.

First, Plaintiff's cited evidence does not support a finding that Plaintiff's disorder met Listing 1.04 prior in 2012 because Dr. Kain does not assess the ambulatory limitations required to meet the

listing.  See 20 C.F.R. § Pt. 404, Subpart B, App. 1, Listing 1.04 (subsection A requiring "limitation of motion of the spine," subsection B requiring "the need for changes in position or posture more than once every 2 hours," and subsection C requiring "inability to ambulate effectively").  In fact, during the same examination, Dr. Kain stated that Plaintiff is "able to perform pretty strenuous work consisting of climbing ladders, lifting, bending, and twisting."  R. 406.  Further, state agency physicians Dr. Bitzer (R. 71-72) and Dr. Aquino (R. 82-84) both found that,  Plaintiff's only physical functional limitations in 2012 were that Plaintiff could: (1) occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk for six hours in an eight-hour workday and sit for more than six hours in an eight-hour workday; and frequently climb ladders, ropes, and scaffolds.  Such functional limitations do not support a finding that Plaintiff's disorder caused the ambulatory limitations required to match the severity of the impairments in Listing 1.04.  Therefore, the Court finds that the ALJ's decision is supported by substantial evidence.

> 2. *Plaintiff is not entitled to a remand based on the brevity of the ALJ's analysis.*

In Plaintiff's objection, he argues that the ALJ erred in his determination because he included only "boilerplate" language, rather than a thorough evaluation.  However, Plaintiff is not entitled to a remand because the ALJ's analysis was sufficient and, further, the ALJ's determination is supported by substantial evidence. Plaintiff provides a list of cases that he argues support remanding a case when an ALJ provides only a "perfunctory analysis."  See e.g. Ribaudo v. Barnhart, 458 F.3d 580, 584 (7th Cir. 2006); Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004).  However, in most of the cases cited, in the perfunctory analysis criticized by the court, the ALJ did not even go so far as to mention the Listings considered.  See id.  Further, in Plaintiff's cited cases, including Minnick v. Colvin, 775 F.3d 929 (7th Cir. 2015)—wherein the ALJ's analysis is most similar to the ALJ's analysis in this case—the court specifically identified evidence in the record that supported a finding that the plaintiff's impairment met the Listing in question. See e.g. Minnick, 775 F.3d at 936 (pointing out that the ALJ ignored a 2009 MIR showing mass effect on two nerve roots).

In this case, the ALJ noted all of the possible ways that Plaintiff could satisfy Listing 1.04 and found that Plaintiff's

impairments did not meet any.  R. 18.  Further, the ALJ's residual functional capacity analysis included an extensive analysis of Plaintiff's cervical issues.  See <u>Rice v. Barnhart</u>, 384 F.3d 363, 370, n.5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole" and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five"). The ALJ's analysis of the evidence regarding Plaintiff's functional capacity further supports the ALJ's finding that Plaintiff's cervical issues do not result in the functional restraints required to meet or medically equal Listing 1.04.  In that analysis, the ALJ considered the pre-surgery evidence of Plaintiff's condition, including Dr. Kain's assessment cited by Plaintiff.  R. 22.  Therefore, the ALJ's analysis was sufficient in this case.

Further, even if the ALJ's analysis were less than adequate, the court will not overturn the ALJ's decision if it is supported by substantial evidence.  See <u>Wurst</u>, 420 Fed.Appx at 488 (upholding an ALJ's decision, despite a "cursory" analysis because the decision was supported by substantial evidence).  Here, the Court has found that the decision is supported by substantial evidence.

### b. **The ALJ Did Not Have to Call an Updated Medical Expert Regarding Plaintiff's Cervical Issues.**

Plaintiff next objects to Judge Schanzle-Haskins' finding that the ALJ did not need to seek a new medical opinion regarding Plaintiff's cervical issues after surgery.  Plaintiff argues that the ALJ improperly "play[ed] doctor" when conducting the residual functional capacity analysis because the ALJ did not rely on a state agency physician.   See Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015) (a conclusion that is not supported by the medical evidence amounts to the ALJ "playing doctor").  Plaintiff reasons that because the ALJ did not "adopt" the opinions of the state agency physicians, the ALJ did not consider them in his analysis.  See Pl. Objection (d/e 24) at 3-4.

For the same reasons stated in the Court's evaluation of the ALJ's analysis regarding Plaintiff's cervical issues in Step 3, the Court finds that the ALJ's residual functional capacity analysis regarding Plaintiff's cervical issues is supported by substantial evidence.  Further, the Court finds that the ALJ based his analysis on medical evidence and, therefore, did not "play doctor."  The ALJ considered the medical evidence of Plaintiff's cervical issues and

found, based on the medical records, that the issues had been corrected by the 2013 surgeries.  R. 22 (citing the statements in the medical records from after Plaintiff's surgeries that Plaintiff had normal strength and normal range of motion in his spine and had a normal gait, among other statements in the medical records). Further, the ALJ explicitly states that he did give consideration to the state agency physician's opinions from 2012.  R. 22 (stating that the state agency opinion's "also supported a finding of 'not disabled'" and that "those opinions deserve some weight"). Therefore, the ALJ did not improperly play doctor by failing to seek out additional medical opinions regarding Plaintiff's cervical issues.

### c. **The ALJ Properly Considered Plaintiff's Obesity in Combination with Plaintiff's Other Impairments.**

Plaintiff also objects to Judge Schanzle-Haskins' finding that the ALJ properly considered Plaintiff's obesity in combination with Plaintiff's other impairments.  Plaintiff argues that the ALJ was required to give Plaintiff's obesity more than minimal attention.  See Goins v. Colvin, 764 F.3d 677, 681 (7th Cir. 2014) (the ALJ's requirement to consider a claimant's medical problems in combination applies to a claimant's obesity, which may not be

"disabling in itself" but "is an added handicap" for a claimant with other impairments). However, the Court finds that the ALJ sufficiently considered Plaintiff's obesity. First, the ALJ prefaced his residual functional capacity analysis by explicitly stating: "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.... Accordingly, the undersigned has fully considered obesity in the context of the overall record in making this decision." R. 19. Further, at the conclusion of the ALJ's analysis, he again referenced his consideration of Plaintiff's obesity, stating: "Due to the combined symptoms and effects of the claimant's diabetes, obesity, degenerative disc disease and residuals status post multiple cervical spine surgeries the claimant is limited to...." R. 24.

Further, Plaintiff does not suggest how his obesity further limits his functioning or exacerbates his impairments. See Hislie v. Astrue, 258 Fed.Appx. 33, 37 (7th Cir. 2007) ("the claimant must articulate how her obesity limits her functioning and exacerbates her impairments"). Plaintiff has not identified any evidence in the record that his obesity affected his functional limitations.

Considering the complete lack of evidence regarding how Plaintiff's obesity impacted his other impairments, the ALJ's consideration was sufficient.

### d. **Judge Schanzle-Haskins' Remaining Findings Do Not Constitute Clear Error.**

Judge Schanzle-Haskins made three additional findings to which Plaintiff did not object: (1) the opinions of Dr. Voss and the mental examination notes cited by the ALJ to support the ALJ's finding that Plaintiff's depression was non-severe; (2) the examination notes of Dr. Hoelzer's office support the ALJ's finding that Plaintiff's diabetes could be controlled with medication and Plaintiff's retinopathy and peripheral neuropathy did not cause functional limitations; and (3) the ALJ did not err by failing to include some of Plaintiff's impairments into the hypothetical question posed to the vocational expert.  The Court finds that Judge Schanzle-Haskins did not err in making these additional findings.

Judge Schanzle-Haskins found that the ALJ's finding that Plaintiff's mental impairments were non-severe, was supported by substantial evidence.  The ALJ noted that Dr. Trello did assign Plaintiff a GAF score of 50 in November 2012, which indicates

serious symptoms or serious functional limitations.  However, the ALJ found that the remaining evidence showed that Plaintiff was not limited.  Dr. Trello found that Plaintiff had normal affect, normal mood, and intact memory and that Plaintiff scored well on numerical testing.  Further, Dr. Voss opined that Plaintiff's mental impairments were not severe.  Finally, Plaintiff reported that his depression was improving in October 2012 and January 2013.

Judge Schanzle-Haskins next found that the ALJ's determination that Plaintiff's diabetes could be controlled with medication was supported by substantial evidence.  The ALJ noted that notes from Dr. Hoelzer's office show that Plaintiff's symptoms were under control when Plaintiff was properly medicating his diabetes.  Plaintiff's symptoms were stable in November 2011 and March 2012 when Plaintiff's diabetes was properly medicated. Plaintiff's symptoms were exacerbated in July 2012 and later only when Plaintiff was not properly taking care of the disease.  In July 2012, Plaintiff stated that he had not been taking his insulin.  R. 491-93.  Then, in September 2012, Dr. Hoelzer noted that Plaintiff had not reported any blood sugar readings from home since his last visit, as Dr. Hoelzer had instructed Plaintiff to do.  R. 488-90.  In

June 2013, Plaintiff explicitly stated to Dr. Hoelzer that his diabetes had not been "tightly controlled."  R. 654-55

Judge Schanzle-Haskins also found that the ALJ did not err by failing to incorporate all of Plaintiff's impairments into the hypothetical question posed to the vocational expert.  Judge Schanzle-Haskins noted that the ALJ is not required to include all of the plaintiff's impairments.  Rather, in this case, the ALJ, as required, incorporated all of Plaintiff's functional limitations caused by Plaintiff's medically determined impairments or combination of impairments.  See Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014).

In reviewing the above findings, the Court does not find clear error.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (d/e 24) are OVERRULED.  The Court ACCEPTS and ADOPTS the Report and Recommendation (d/e 23) in its entirety.  Accordingly, Plaintiff's Motion for Summary Judgment (d/e 15) is DENIED; and the Commissioner's Motion for Summary Affirmance (d/e 19) is GRANTED.  The decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.  This case is CLOSED.

ENTER: August 29, 2016

FOR THE COURT:

                    s/Sue E. Myerscough
                  SUE E. MYERSCOUGH
          UNITED STATES DISTRICT JUDGE